# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 31, 2025          Decided July 11, 2025

No. 24-1092

ENERGY HARBOR, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

OLD DOMINION ELECTRIC COOPERATIVE AND PJM
INTERCONNECTION, L.L.C.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Pamela T. Wu* argued the cause for petitioner. With her on the briefs was *J. Daniel Skees*.

*Robert M. Kennedy*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor. *Angela X. Gao*, Trial Attorney, Federal Energy Regulatory Commission, entered an appearance.

*Andrew T. Swers* argued the cause for intervenor in support of respondent. With him on the brief was *Ryan J. Collins. Wendy B. Warren* entered an appearance.

Before: PILLARD and GARCIA, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: PJM Interconnection, L.L.C. operates the largest competitive wholesale energy market in the country. It assessed $12 million in penalties on Energy Harbor, LLC, the owner and operator of the W.H. Sammis power plant, for failing to comply with PJM's Tariff during a major winter storm in December 2022. Energy Harbor filed a complaint with the Federal Energy Regulatory Commission contesting the penalties. FERC denied the complaint. Energy Harbor now petitions for judicial review of that decision.

**I.**

**A.**

PJM operates an interstate transmission grid covering all or parts of thirteen mid-Atlantic and Midwestern states and the District of Columbia. PJM's grid connects individual customers to electricity generation companies via local utilities. PJM does not itself produce electricity. Instead, its role is as a middleman. End-users purchase electricity from their local utility, that utility purchases electricity from PJM, and PJM purchases the electricity from an electricity generation company. To complete the transaction, the electricity is physically transmitted from electricity generation companies, across high-voltage power

lines operated by PJM, to the user's local utility.

Because the demand for electricity is variable, the local utilities and PJM require assurances that there will be sufficient supply when demand is high. PJM solves this problem by entering into futures contracts with generation companies. Each company commits to produce up to a set amount of electricity during a given time period, at a specified price. That price is set at yearly auctions held by PJM. The rates, rules and operating procedures for this system are FERC-approved and outlined in PJM's "Open Access Transmission Tariff."

**B.**

In 2014, PJM proposed revisions to its Tariff to ensure that generators would deliver electricity when needed.[1] FERC approved the changes in 2015, *see PJM Interconnection, L.L.C.*, 151 FERC ¶ 61,208, at P 2 (2015), and our court upheld FERC's decision in *Advanced Energy Management Alliance v. FERC*, 860 F.3d 656, 674 (D.C. Cir. 2017). In essence, the proposal implemented a pay-for-performance model, charging generators stiff penalties if they failed to perform during any emergency period PJM declared. These penalties were then to be used to fund bonus payments to generators that over-performed in relation to their capacity commitments. *See PJM Interconnection,* 151 FERC ¶ 61,208, at P 2.

---

[1] Technically, PJM revised its "Market Rules," which include "the rules, standards, procedures, and practices of the PJM Markets set forth in the PJM Tariff, the PJM Operating Agreement, the PJM Reliability Assurance Agreement, the PJM Consolidated Transmission Owners Agreement, the PJM Manuals, the PJM Regional Practices Document, the PJM-Midwest Independent Transmission System Operator Joint Operating Agreement," and other documents. J.A. 261.

To illustrate the concept, take the following example. Imagine a generator with a 100-megawatt capacity commitment. During an emergency period, PJM calls on that plant to provide 90 megawatts—a request clearly within the 100-megawatt commitment. If the generator cannot deliver the full request, it owes a penalty proportional to the shortfall. Thus, if the generator is only able to produce 80 megawatts, it owes PJM a penalty on 10 megawatts. And if it cannot deliver at all, it owes a penalty for the full 90 megawatts. *See Advanced Energy*, 860 F.3d at 665 (describing this hypothetical).

The actual penalty scheme is more complex—and that complexity led to this litigation.

The Tariff defines the owner of an electricity generation company as a "Capacity Market Seller." *See* J.A. 221. Each Capacity Market Seller owns a facility that produces a set number of megawatts and pledges that capacity through PJM's auctions. A Capacity Market Seller's pledged capacity is termed the "Capacity Resource." *See* J.A. 302. But since generation companies sometimes fail to live up to their commitments, the Tariff imposes a penalty for nonperformance. PJM evaluates a Capacity Market Seller's nonperformance by looking both at its "Expected Performance," or promised output, and its "Actual Performance," or metered output of energy actually delivered to PJM. *See* J.A. 291-93.

The Tariff creates a multi-step process for determining Expected Performance. The initial step is to determine what a Capacity Resource can produce in ideal conditions, or the "[I]nstalled [C]apacity." *See Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804, 807 (D.C. Cir. 2007). But recognizing that electrical generation is often interrupted by technical problems, the Tariff decreases Expected Performance below the level of a

facility's Installed Capacity in two ways.

First, PJM accounts for a Capacity Resource's past performance when calculating Expected Performance. The "Forced Outage Rate" represents the historical rate at which a Capacity Resource performs, relative to its Installed Capacity. *Id.* Multiplying the inverse of the Forced Outage Rate—one minus the Forced Outage Rate—by the Installed Capacity produces an estimate of a generator's likely capacity based on its past results. This is termed "Unforced Capacity." J.A. 324. Resource Committed Capacity is the total megawatts of Unforced Capacity of the Capacity Resource committed by a Capacity Market Seller. J.A. 292.

Next, the Tariff adds an additional buffer by looking to the average performance of all generators within the PJM grid. This is the "Balancing Ratio," which is calculated by dividing PJM-wide Actual Performance by PJM-wide Unforced Capacity. *Id.* If, for example, all PJM members committed 1,000,000 megawatts but only produced 800,000 megawatts, the Balancing Ratio for that period would be 0.8.

Multiplying the Balancing Ratio by Resource Committed Capacity produces Expected Performance. Said differently, Expected Performance is the total megawatts that a Capacity Resource can produce in ideal conditions (Installed Capacity), adjusted for (i) that Capacity Resource's historical performance (Forced Outage Rate), and (ii) the performance of all of PJM's members (Balancing Ratio). Or more simply:

Unforced Capacity = Installed Capacity * (1 - Forced Outage Rate)

Resource Committed Capacity = total megawatts of

committed Unforced Capacity

Expected Performance = Resource Committed Capacity * Balancing Ratio

Having calculated a generator's Expected Performance, PJM assesses whether the Capacity Resource's Actual Performance was sufficient. Any difference between Expected Performance and Actual Performance is a "Performance Shortfall." *See* J.A. 291.

Performance Shortfalls are particularly concerning during periods of peak demand or extreme weather conditions. Accordingly, the Tariff enables PJM to declare "Emergency Action" periods, split into a series of five-minute "Performance Assessment Intervals." During each Performance Assessment Interval, PJM assesses Capacity Resource performance to determine whether any penalties should be charged or bonuses awarded. *Id*. And given the math behind the Expected Performance calculation, PJM effectively penalizes Capacity Resource Sellers only when their Capacity Resources underperform both their own track records and the actual performance of similarly situated Resources across PJM.

One final twist. Even in an Emergency Action, a Performance Shortfall may be excused in circumstances involving a scheduled outage approved by PJM. Section 10A(d) of the Tariff provides that:

"[A] Capacity Resource . . . shall not be considered in the calculation of a Performance Shortfall for a Performance Assessment Interval to the extent such Capacity Resource . . . was unavailable during such Performance Assessment Interval solely because the resource on which such Capacity

Resource . . . is based was on a Generator Planned Outage or Generator Maintenance Outage approved by the Office of the Interconnection . . ..” J.A. 294.

This exception, and the definition of the term Capacity Resource, are the subject of the present dispute.

## C.

Energy Harbor owns and operates the W.H. Sammis Plant, a coal-fired generation facility within the PJM region. The Sammis Plant consists of three units totaling 1,490 megawatts of Installed Capacity. Unit 5 has 290 megawatts, and Units 6 and 7 have 600 megawatts each. Energy Harbor bid the three Sammis units in the capacity auction for the June 2022 through May 2023 delivery year and secured a Resource Committed Capacity of 1,164 megawatts.[2]

In December 2022, as a result of a severe winter storm, much of PJM's geographic footprint, including the Sammis Plant, faced severe weather conditions and record cold temperatures approaching ten degrees Fahrenheit. PJM issued "Emergency Actions" on December 23 and 24, triggering Performance Assessment Intervals.

From November 27 through December 26, 2022, the Sammis Plant was on a PJM-approved maintenance outage to repair a boiler feed pump at Unit 6. This reduced Unit 6's available capacity by 300 megawatts. Thus, heading into the storm, the

---

[2] Energy Harbor's Resource Committed Capacity (1,164 megawatts) divided by its Installed Capacity (1,490 megawatts) produces the inverse of the Forced Outage Rate (78.1%). Therefore, the Forced Outage Rate is 21.9%.

Sammis Plant had 1,190 megawatts of Installed Capacity available to fulfill Energy Harbor's commitments. For reasons not specified in the record, Energy Harbor had previously paid other market participants to take on a portion of its commitments. Those transactions lowered the Sammis Plant's Resource Committed Capacity to 1,012 megawatts on December 23 and 1,036 megawatts on December 24. On those two days, the Plant had an Expected Performance of approximately 865 and 840 megawatts, respectively, based on PJM-wide Balancing Ratios of approximately 85% and 81%, respectively.

Nonetheless, Energy Harbor did not meet its commitments. As the storm hit, Units 5 and 7 experienced unexpected failures, also known as "forced outages." The Sammis Plant's Actual Performance averaged 490 megawatts on December 23 and 698 megawatts on December 24. PJM ultimately assessed Energy Harbor $12,157,111.91 in nonperformance penalties.

On April 27, 2023, Energy Harbor filed a complaint with FERC alleging that PJM's penalty calculation was inconsistent with the terms of the Tariff. Later that year, the Commission denied Energy Harbor's complaint, finding that PJM had not misinterpreted the Tariff or miscalculated the penalties assessed to Energy Harbor. *See Energy Harbor LLC v. PJM Interconnection, L.L.C.*, 185 FERC ¶ 61,203, at P 25 (2023) (Complaint Order). Energy Harbor requested rehearing but this was denied by operation of law. *See Energy Harbor LLC v. PJM Interconnection, L.L.C.*, 186 FERC ¶ 62,070 (2024). Energy Harbor then timely petitioned for review.

**II.**

**A.**

At the heart of the parties' dispute is the penalty exception found in Section 10A(d) of PJM's Tariff. As stated above, Section 10A(d) provides that a "Capacity Resource . . . shall not be considered in the calculation of a Performance Shortfall . . . to the extent such Capacity Resource . . . was unavailable . . . solely because the resource on which such Capacity Resource . . . is based was on a Generator Planned Outage or Generator Maintenance Outage approved by the Office of the Interconnection . . .." J.A. 294.

PJM interpreted the Tariff as excusing nonperformance only "to the extent" that a Capacity Resource is "unavailable *solely* because" of a maintenance outage. J.A. 132 (emphasis added). To determine whether the maintenance outage was the "sole" cause of Energy Harbor's nonperformance, PJM first calculated the amount of Installed Capacity not then-subject to a maintenance outage. PJM then compared that amount, 1,190 megawatts, to Energy Harbor's Expected Performance of 865 megawatts on December 23, and 840 megawatts on December 24. Because the Plant had sufficient capacity to meet its Expected Performance but failed to do so, PJM determined that the maintenance outage could not be the "sole" cause of the Plant's Performance Shortfall. In its view, the forced outages were each causes of the Shortfall as well. PJM concluded that the Section 10A(d) exemption, therefore, did not apply. The Commission concurred in PJM's interpretation of the Tariff.[3]

---

[3] The Commission argues that its interpretations of filed tariffs are owed "substantial deference." FERC Br. at 24 (quoting *E. Tex. Elec. Coop. v. FERC*, 90 F.4th 579, 587 (D.C. Cir. 2024)). It is true that, "[i]n the past, we have deferred to FERC's reasonable interpretation of ambiguous tariffs and contracts within its jurisdiction" but it is an open question whether those deference principles "survive the overruling of *Chevron*." *NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 368 (D.C. Cir. 2024) (citing *Loper Bright Enters. v.*

J.A. 189-90.

Energy Harbor argues, as it did before the Commission, that Section 10A(d) requires PJM to deduct any capacity that was unavailable due to an approved Maintenance Outage from the Performance Shortfall. This interpretation would provide any Capacity Market Seller undergoing a "Generator Planned Outage or Generator Maintenance Outage approved by the Office of the Interconnection," J.A. 294, with a credit against any Performance Shortfall. Energy Harbor argues separately that PJM's interpretation is foreclosed by the fact that Energy Harbor had not committed to supply the Sammis Plant's entire Installed Capacity, just its Resource Committed Capacity. In Energy Harbor's view, because Expected Performance, and thus Performance Shortfall, is calculated using the Resource Committed Capacity—a measure that accounts for the Forced Outage Rate—PJM's deduction from the Plant's Installed Capacity makes little sense.

PJM's interpretation of the Tariff was proper, as was the Commission's endorsement of it. The text of the Tariff compelled PJM to start with the Sammis Plant's Installed Capacity. Section 10A(d) applies "to the extent [a] Capacity Resource . . . was unavailable . . . solely because the resource on which such Capacity Resource is based" was on a maintenance outage. *Id.* Performance Shortfall represents a Capacity Resource's unavailability. As discussed *infra*, the Sammis Plant, and its entire Installed Capacity, is the "resource" on which Energy Harbor's Capacity Resource is based. PJM correctly evaluated whether the maintenance outage reduced the Sammis

---

*Raimondo*, 603 U.S. 369 (2024)). That question is not presented in this case. Energy Harbor has not disputed the Commission's deference claim.

Plant's Installed Capacity enough to constitute the "sole" cause of the Performance Shortfall.

Even accounting for the approved maintenance outage, the Sammis Plant had enough Installed Capacity to meet Energy Harbor's Expected Performance during the emergency but failed to do so because of forced outages. So, it cannot be said that the maintenance outage was the "sole" cause of the shortfall. This interpretation does not foreclose the application of the Section 10A(d) exemption when a Capacity Resource faces both a forced outage and a Maintenance Outage. If the forced outage is insufficient to account for the entirety of the Performance Shortfall, then the Maintenance Outage would be the sole reason for the rest of the shortfall. The Tariff excuses such nonperformance 'to the extent' that the forced outage did not cause the Performance Shortfall.

Moreover, the Tariff treats Capacity Resources as underwritten by the full Installed Capacity of their supporting facilities. Energy Harbor was not permitted to withhold any of the Sammis Plant's Installed Capacity from PJM. Capacity Market Sellers are required to offer the "[Installed Capacity] equivalent of the Market Seller's cleared [Unforced Capacity] commitment" into the Day-ahead Energy Market every day. J.A. 271; *see also PJM Interconnection, L.L.C.*, 186 FERC ¶ 61,080, at P 130 (2024) ("PJM requires resources to offer their full physical capability into the energy market, and this physical capability generally exceeds the [Unforced Capacity].").

**B.**

Energy Harbor's next argument—that "eligibility for the excusal under Section 10A(d) must be assessed for each generating unit"—also fails. Pet'r Br. at 31. This argument stems from Energy Harbor's mistaken interpretation of a phrase in

Section 10A(d): "resource on which such Capacity Resource . . . is based." Energy Harbor writes that the phrase "necessitates consideration of unavailability at the 'resource' level—i.e., by generating unit and not at the Capacity Resource level—to determine 'the extent such Capacity Resource . . . was unavailable during the Performance Assessment Interval.'" Pet'r Br. at 30-31.

This interpretation requires one to distinguish between Section 10A(d)'s use of the words "resource" and "Capacity Resource." In Energy Harbor's view, the Sammis Plant, as a whole, is a Capacity Resource and the separate Sammis generating units are each supporting "resources." Pet'r Br. at 31. If true, "[t]he unavailability at Sammis Unit 6 during the Performance Assessment Intervals was solely due to the Generator Maintenance Outage" and would be excusable under Section 10A(d). Pet'r Br. at 20.

FERC had good reason to reject Energy Harbor's position, stating that "the entire Sammis Facility is the 'resource' at issue in Section 10A(d)." J.A. 189. This reading does not render "superfluous" the word "resource." Pet'r Br. at 31. The Tariff defines a Capacity Resource as the amount of net megawatts committed from one or many generating units, not a physical facility. J.A. 302. Therefore, the Sammis Plant *has* a Capacity Resource of 1,490 megawatts, but it is not itself a Capacity Resource. The Sammis Plant is instead a lowercase-r "resource" that supports Energy Harbor's Capacity Resource—the net megawatts available from the Sammis Plant.

Another piece of evidence against Energy Harbor's interpretation is that the PJM capacity auction makes no distinction between Capacity Market Sellers whose Capacity Resources rely on a single or multiple separate units. J.A. 189-

90.

## C.

Energy Harbor casts and recasts its Tariff argument into various other APA challenges. *See, e.g.*, Pet'r Br. at 36-41. For the reasons already stated, these challenges also fail.

Energy Harbor then challenges the Commission's denial of its rehearing request by operation of law as arbitrary and capricious because the order did not address "any of the arguments that Energy Harbor raised." Pet'r Br. at 42. The Denial Notice merely states that, absent action by the Commission within 30 days, Energy Harbor's request "may be deemed to have been denied." *Energy Harbor*, 186 FERC ¶ 62,070. The Commission cites a statute, a regulation and a precedent of this court, each of which recognizes that FERC may decline to issue a rehearing order in this manner without running afoul of the APA. *Id.* (citing 16 U.S.C. § 825l(a); 18 C.F.R. § 385.713(f) (2023); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc)).

## III.

For the foregoing reasons, we deny Energy Harbor's petition for review.

*So ordered.*