# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

––––––

Argued October 18, 2004     Decided January 14, 2005

No. 03-1228

EDISON MISSION ENERGY, INC. AND
EDISON MISSION MARKETING & TRADING, INC.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., ET
AL.,
INTERVENORS

––––––

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

––––––

*Peter W. Brown* argued the cause for petitioners. With
him on the briefs were *Richard C. Mooney* and *Pamela G.
Van Horn*.

*Robert H. Solomon*, Deputy Solicitor, Federal Energy
Regulatory Commission, argued the cause for respondent.
With him on the brief were *Cynthia A. Marlette*, General
Counsel, and *Dennis Lane*, Solicitor.

*William F. Young* argued the cause for intervenors in support of respondent. With him on the brief were *Susan E. Dove*, *Elias G. Farrah*, *Rebecca J. Michael*, *Neil H. Butterklee*, and *Edgar K. Byham. David E. Blabey*, *Donald K. Dankner* and *David P. Yaffe* entered appearances.

*Diane T. Dean* argued the cause and filed the brief for intervenor-appellee Public Service Commission of New York.

Before: EDWARDS and RANDOLPH, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Edison Mission, an independent power producer (which we treat as one with its fellow petitioner, a wholly owned subsidiary engaged in power marketing), challenges two rulings of the Federal Energy Regulatory Commission. It says that the rulings allow the New York Independent System Operator ("NYISO") to "mitigate," i.e., unilaterally reduce, the bid prices that generators and marketers submit to sell power in New York State under conditions where, in the judgment of the Commission itself, there should be no such mitigation. Specifically, Edison Mission says that the rulings will cut back price increments that are due to scarcity rather than to any exercise of market power, and as a result will impair the growth of needed power supply. Because of the seeming inconsistency in FERC's positions, we reverse and remand the orders.

\* \* \*

The NYISO is a non-profit corporation that operates the bulk power transmission system in New York. It sells its services under tariffs filed with FERC, and administers two sets of bid-based energy markets. First is the "Day-Ahead Market," in which the NYISO derives a market-clearing price from the sellers' and buyers' price and quantity indications for the next day; sales are then made at the market-clearing price. Second is the "Real-Time Market," designed to ensure system reliability by calculating hourly clearing prices and allowing sellers to offer supplies to meet additional demand and even to revise day-ahead bids. See *Cent. Hudson Gas & Elec. Corp.*, 86 FERC ¶ 61,062 at 61,222-23 (1999).

Under Market Mitigation Measures ("MMM") approved by FERC as part of the NYISO's Market Monitoring Plan, the NYISO has monitored the electricity markets for circumstances in which (the NYISO contends) exercises of market power, as opposed to true scarcity, drive up prices. See *New York Indep. Sys. Operator, Inc. & Consolidated Edison Co., Inc.,* 99 FERC ¶ 61,246 at 62,038, 62,041 (2002) ("Initial Order"). Under the MMM the NYISO has applied so-called "conduct" and "impact" screens to bids in the Day-Ahead Market. The conduct screen sifts out prices that by some amount or percentage exceed a "reference price." The latter may be based on prior bids from a unit, or some direct calculation of the unit's production costs. New York Independent System Operator, Inc., FERC Electric Tariff (Services Tariff), Attachment H, "NYISO Market Monitoring Plan" ("Attachment H") at § 3.1.4. The impact screen tests whether that price increment actually would cause market-clearing prices to rise a certain amount or percentage over the price that would prevail in the event of mitigation.

Under the MMM, if the conduct and impact tests were met, the NYISO would consult with the supplier to request an

explanation of any legitimate basis for the unusually high bid price. If dissatisfied with the explanation, the NYISO would mitigate the bid price to a default bid equal to the supplier's reference price. The program would then calculate the market-clearing price, using the supplier's default bid in lieu of its actual bid. But the supplier would, like all other suppliers, be paid the market-clearing price for that period. See Initial Order, 99 FERC ¶ 61,246 at 62,038, 61,041; see also Attachment H at §§ 3, 4.2.

These procedures, as promulgated in 1999 and revised in 2000, see *New York Indep. Sys. Operator, Inc.,* 89 FERC ¶ 61,196 (1999); *New York Indep. Sys. Operator, Inc.*, 90 FERC ¶ 61,317 (2000), are dubbed "manual" because of built-in lags. (They would be more accurately labeled "less automated," as the process is not done by hand.) Under them, the NYISO has been unable to complete application of the conduct and impact tests until after the end of a given day's Day-Ahead Market. As mitigation is not retroactive, the NYISO had no remedy for high prices charged before the analysis was complete. See *New York Indep. Sys. Operator, Inc.,* 95 FERC ¶ 61,471 at 62,688 (2001) ("June 2001 Order"); see also *New York Indep. Sys. Operator, Inc.,* 97 FERC ¶ 61,155 at 61,682 (2001) (rejecting claim for retroactive calculation of prices to compensate for high cost to consumers). In practice the NYISO evidently enforced mitigation under the "manual" scheme by cutting a supplier's price the following day, "if the bidding conduct continues and market conditions [were] expected to be similar." See May 17, 2001 letter to FERC from William F. Young, counsel for NYISO.

In 2001 the NYISO sought to amend its services tariff, pursuant to § 205 of the Federal Power Act, 16 U.S.C. § 824d, proposing to "automate" its mitigation procedures and thus be

5

able to mitigate bids in real time rather than the following day. See *Mirant Americas Energy Marketing, L.P. v. New York Indep. Sys. Operator, Inc.*, 95 FERC ¶ 61,189 at 61,670 (2001). The Automated Mitigation Procedure ("AMP") differs from the manual MMM in four important respects. First, it doesn't run the conduct and impact tests at all unless the software determines that prices will exceed $150/MWh without mitigation. See Initial Order, 99 FERC ¶ 61,246 at 62,036-37. Second, when those tests are run, mitigation will occur automatically and immediately, substituting the supplier's reference prices for the bids actually made. See June 2001 Order, 95 FERC ¶ 61,471 at 62,688. Third, bid mitigation occurs if the bids of all suppliers running afoul of the conduct test would in the aggregate trigger an impact on market-clearing price, as opposed to the bidder-by-bidder analysis under the manual system. See Initial Order, 99 FERC ¶ 61,246 at 62,041. Finally, any consultation with a supplier over mitigation occurs only at the supplier's request, and most likely after mitigation has occurred.

In 2001 FERC twice approved the use of the AMP, but limited its time span because of doubts about its suitability. In approving the AMP for the peak demand of the summer season, the Commission expressed concern "that the proposed AMP may mitigate bids in situations where market power is not the cause for high or volatile bids," June 2001 Order, 95 FERC ¶ 61,471 at 62,690, and "that the proposal may not provide for sufficient consultation with generators to reasonably establish that particular bids were attempts to exercise market power," *id*. It observed that "automatic market power mitigation may be most appropriate where it is tied to structural market power problems . . . where generators would otherwise be in a position to name their price." *Id*. FERC later approved the NYISO's AMP plan for an additional year, while instructing the NYISO to respond to

FERC's concerns that the AMP would result in "unnecessary mitigation." *New York Indep. Sys. Operator, Inc.,* 97 FERC ¶ 61,242 at 62,098 (2001).

In March 2002 the NYISO filed a comprehensive market mitigation plan, which included the AMP. Edison Mission objected, arguing that outside New York City the AMP would mitigate when temporary shortages, rather than market power, caused the price hikes. This would deprive suppliers of scarcity rents and would deter new suppliers from entering the market. FERC nonetheless approved the AMP, for the first time imposing no time limit. See Initial Order, 99 FERC ¶ 61,246 at 62,052.

On Edison Mission's application for rehearing, the Commission adhered to its position, saying that Edison Mission "submit[ted] no evidence that NYISO's mitigation plan keeps prices from rising to competitive levels." *New York Indep. Sys. Operator, Inc. & Consolidated Edison Co., Inc.,* 103 FERC ¶ 61,291 at 62,136 (2003) ("Rehearing Order"). The Commission also offered the theory that if the markets outside New York City were competitive, "the AMP should not be triggered and should have virtually no impact on the markets," and said that Edison Mission had "not made its case" that "the AMP will trigger during competitive conditions." *Id*. at 62,139.

\* \* \*

We first address a jurisdictional challenge by the NYISO and other intervenors on behalf of FERC. Pointing out that suppliers such as Edison Mission had for some time been subject to the MMM, and had twice been subject to temporary AMPs, they argue that the orders now before us neither impose nor threaten Edison Mission with any new

harm. Alternatively, they argue that Edison Mission's claims here are simply a collateral attack on the prior MMM and temporary AMP orders, for which the time to seek review has expired. See also FERC Br. at 8; compare *New York Indep. Sys. Operator, Inc.*, 108 FERC ¶ 61,188, 2004 WL 1284385 at *4 (¶ 16) (2004) ("August 2004 Order").

These arguments are plainly inconsistent with the NYISO's reasoning in seeking the AMP—that it would tend to cure the MMM's deficiencies as a means of securing what the NYISO regarded as adequate mitigation. By enforcing mitigation far more rapidly, shifting the burden of initiating consultation from the NYISO to suppliers, and making the AMP permanent, the orders ramp up mitigation's potential effects on Edison Mission. Granted, both the manual MMM and the two prior temporary AMPs pose the same conceptual problem as the current permanent AMP—the failure to distinguish between price increments due to scarcity (which are completely consistent with perfect competition) and ones due to exercises of market power (which are by definition inconsistent with perfect competition). But the shift to what FERC and the NYISO claimed was a more effective mitigation program obviously increased the likely harm to Edison Mission, as did establishment of the reformed program on a permanent basis. See *Competitive Telecommunications Ass'n v. FCC*, 309 F.3d 8, 11-12 (D.C. Cir. 2002); *Public Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 151 (D.C. Cir. 1990).

We thus turn to the merits, reviewing whether under standard principles the Commission's decisions were arbitrary and capricious. See 5 U.S.C. § 706(2)(A). We find that FERC did not "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v.*

*State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citation omitted).

Contrary to FERC's statement in the Rehearing Order, Edison Mission offered support for its claims. In the first place, FERC appears not even to take issue with Edison Mission's contention that the New York power market outside New York City is "workably competitive." Before the Commission, Edison Mission pointed out that an affidavit of the NYISO's own expert, Dr. David B. Patton, acknowledged such competition. See Protest of Aquila Merchant Services, Inc., Edison Mission Energy Inc., and Edison Mission Marketing & Trading, Inc. of the Compliance Filing of the New York Independent System Operator, Inc. Regarding Comprehensive Market Mitigation Measures and Request for Interim Extension of Existing Automated Mitigation Procedure ("Edison Mission Protest") at 26 (citing affidavit of Dr. Patton).

The Commission's brief responds by noting that Dr. Patton plainly did not regard his statement as inconsistent with occasional exercises of market power, and a need to protect against them, as shown by his advocacy of the AMP. See FERC Br. at 28-29. This isn't much of an answer. While the Commission can obviously use a definition of workably competitive that allows for occasional exercises of market power, the presence of workable competition would suggest that many, perhaps most, possibly all, of the bids triggering mitigation will be due not to market power but to temporary scarcity. At least this would be so unless the conduct-impact tests somehow differentiated between bid increments due to scarcity and ones due to market power—which the Commission doesn't claim. This inability to distinguish presumably explains the Commission's earlier acknowledgment that "automatic market power mitigation

may be most appropriate where it is tied to structural market power problems . . . where generators would otherwise be in a position to name their price." June 2001 Order, 95 FERC ¶ 61,471 at 62,690.

In addition to the natural inference that in conditions of workable competition the application of a "conduct" test based on production cost would catch scarcity-based bid hikes, Edison Mission offered a plausible example. Attached to the Edison Mission Protest is the Affidavit of Abram Klein ("Klein Affidavit"), pointing out that Day-Ahead Market prices for the highest-priced six hours of August 9, 2001, a day of extreme scarcity, averaged $762/MWh, well below New York's price cap of $1,000/MWh. Klein Affidavit at 2, 7. (The price cap is an additional limit on prices, applying even if price increments are scarcity-based but where (the Commission assumes) demand is completely inelastic. See *New York Indep. Sys. Operator, Inc.*, 97 FERC ¶ 61,095, 61,496 (2001).) Even though the AMP was not triggered, Klein plausibly—and without contradiction—attributed that to generators' awareness of the AMP and anxiety to avoid the effect of its rather serious penalty provisions. Klein Affidavit at 7; for details of penalty provisions, see Attachment H at § 4.3.

If prices are suppressed in a competitive market, a natural inference is that suppliers who could otherwise profitably enter will be deterred from entry. Certainly FERC offered nothing to contradict the analyses to that effect offered by Klein and by Dr. Larry E. Ruff. See Affidavit of Larry E. Ruff ("Ruff Affidavit") at 7; Klein Affidavit at 3; see also Edison Mission Protest at 27-31.[1] In addition, Edison Mission

---

[1] We note with dismay that Edison Mission's briefs, though often referring to the specific points made in the Klein and Ruff affidavits, virtually never do us the courtesy of citing the relevant pages. Such a violation of Rule 28(a)(9)(A) of the Federal Rules of

pointed to statements by the NYISO's chief executive officer warning that "New York remains headed towards a very serious power shortage." *Id*. at 34.

FERC responded to Edison Mission's concerns with vague generalities. It summarized the arguments of both parties and then perfunctorily concluded that the NYISO had the better argument—with little or no further explanation. See, e.g., Initial Order, 99 FERC ¶ 61,246 at 62,041-42 ("We accept NYISO's contention that review of bids individually in the AMP is impractical if not impossible to implement and therefore will not require the changes requested by intervenors."). Nowhere did it seriously attempt to refute the analysis of Edison Mission's experts. And nowhere did FERC try to reconcile its embrace of the AMP here with its apparent acceptance of the workably competitive character of New York power markets outside New York City, or with its earlier apparent view that the AMP was too strong medicine for markets without material structural defects. Finally, one of its arguments for denying relief—the suggestion that if the markets outside New York City were competitive, "the AMP should not be triggered and should have virtually no impact on the markets," Rehearing Order, 103 FERC ¶ 61,291 at 62,139—appears simply to deny that scarcity can have an impact on competitive market prices.

The AMP may well do some good by protecting consumers and utilities against price increments caused by the exercise of market power. But the Commission gave no reason to suppose that it does not also wreak substantial harm—in curtailing price increments attributable to genuine scarcity that could be cured only by attracting new sources of supply. "[T]he crucial question—one the Commission left unaddressed—is whether the program FERC approved will do

---

Appellate Procedure is sanctionable under Rule 46(c).

more good than harm." *Maryland People's Counsel v. FERC*, 761 F.2d 780, 788-89 (D.C. Cir. 1985) (internal citation and quotation marks omitted). And the Commission's contradiction of its prior rulings acknowledging the potential ill effects of forcing down prices absent structural market distortions is the epitome of agency capriciousness. See *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 57.

FERC finally defends the orders by arguing that they only "allow[ed] the AMP to remain in effect for a limited period" while the Commission gathered additional real-world data about how the AMP operates, evidently through a report that FERC required the NYISO to file by December 2, 2004. FERC Br. at 35; see also Rehearing Order, 103 FERC ¶ 61,291 at 62,139 ("The Commission did not accept AMP as a permanent measure."). This claim of limited duration appears based on FERC's promise to reconsider the AMP in the future; but that leaves the AMP to operate with as unlimited a time span as any rule that an agency may reconsider at a later date—i.e., all agency rules except for ones that really are temporary.

The Commission's orders are vacated and the case remanded.

*So ordered*.