# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 1, 2021       Decided January 25, 2022

No. 20-1084

THE CITY AND COUNTY OF SAN FRANCISCO,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PACIFIC GAS AND ELECTRIC COMPANY,
INTERVENOR

———

Consolidated with 20-1297

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Katharine M. Mapes* argued the cause for petitioner. With her on the briefs were *William S. Huang* and *Jeffrey M. Bayne*.

*Scott Ray Ediger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Joshua S. Levenberg* argued the cause for intervenor Pacific Gas and Electric Company in support of respondent. With him on the brief was *Alexandra J. Ward*. *Alyssa T. Koo* entered an appearance.

————

No. 20-1313

CITY AND COUNTY OF SAN FRANCISCO,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

————

Consolidated with 20-1458

————

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

————

*Katharine M. Mapes* argued the cause for petitioner. With her on the briefs were *William S. Huang* and *Jeffrey M. Bayne*.

*Scott Ray Ediger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Alexandra J. Ward* argued the cause for intervenor Pacific Gas and Electric Company in support of respondent. With her on the brief were *Joshua S. Levenberg*, *Laura Edelstein*, *Steven J. Ross,* and *Shaun M. Boedicker*. *Alyssa T. Koo* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: San Francisco petitions for review of orders by the Federal Energy Regulatory Commission denying its complaints and requests for rehearing regarding its delivery of electricity to end users. San Francisco purchases distribution services from the Pacific Gas & Electric Company ("PG&E") under the terms of its open-access Tariff. It challenged PG&E's refusal to: (1) offer secondary-voltage service in lieu of more burdensome primary-voltage service to certain San Francisco sites and (2) provide service to delivery points that San Francisco maintains are eligible for service under the Tariff's grandfathering provision. San Francisco contends that the Commission erred both when it found that PG&E's denial of secondary-voltage service was consistent with Tariff requirements and the Federal Power Act, and when it interpreted the Tariff's grandfathering provision narrowly to allow PG&E's interpretation. For the following reasons, the court grants San Francisco's petitions.

## I.

Electricity flows from generators to end users in two stages: transmission and distribution. Transmission lines transport bulk power from generators across long distances. That power is reduced to a lower voltage by a transformer and

flows to consumers through distribution lines. U.S. Dep't of Energy, *United States Electricity Primer*, *DOE/OE-0017*, at 13, 21 (July 2015). Distribution lines operate at higher (primary) and lower (secondary) voltages. Because consumers typically cannot use electricity at primary voltages, consumers that receive primary-voltage service require a transformer to reduce the electricity's voltage in addition to primary metering and other equipment. Therefore, primary-voltage service involves relatively high fixed costs, but is cheaper per unit of electricity provided. By contrast, secondary-voltage service has lower fixed costs but higher unit costs. *See* Complaint (No. 20-1313), Decl. of Rod Maslowski, Senior Consultant with Flynn Resource Consultants, ¶¶ 7-8.

San Francisco's publicly owned utility, the San Francisco Public Utilities Commission, owns a power supply system in the Hetch Hetchy Valley and transmission lines that transmit power to San Francisco. *Id.* at 5-6. San Francisco sells Hetch Hetchy power directly to the end-users in the city. It obtained the property rights to develop the Hetch Hetchy System under the Raker Act of 1913, Pub. L. No. 63-41, 38 Stat. 242 (1913). There, "Congress was motivated by a desire to provide the people of San Francisco with the advantages of cheap power and City competition with private power companies such as Pacific Gas and Electric." *City & Cnty. of San Francisco v. United Airlines*, 616 F.2d 1063, 1068 (9th Cir. 1979).

San Francisco does not own distribution lines, however, and relies on PG&E's distribution system to serve its end-users. Complaint (No. 20-1313) at 2. It prefers to receive secondary voltage from PG&E's distribution system because electricity from PG&E is delivered to over 2,200 metered interconnection points, most of which serve a single building. *Id.* at 3, Maslowski Decl. ¶ 6. Because a relatively small amount of electricity is required at many points, San Francisco prefers to

avoid the high fixed costs of receiving primary-voltage service at each point. *Id.* at 17. And because PG&E's retail service area covers the city, the San Francisco Commission is both a customer and competitor of PG&E.

From 1945 to 2015, San Francisco purchased wholesale distribution service from PG&E under a series of bilateral agreements, the most recent of which was signed in 1987. While San Francisco was receiving service pursuant to the 1987 agreement, the Federal Energy Regulatory Commission (the "Commission") approved PG&E's Tariff, which stated the generally applicable terms for "open-access" wholesale distribution service. Pac. Gas & Elec. Co., Wholesale Distribution Tariff, FERC Electric Tariff Volume No. 4, Docket Nos. EL15-3-002, et al., Ex. PGE-7.

**II.**

San Francisco's complaint in No. 20-1313 concerns PG&E's refusal to provide secondary-voltage distribution service at certain interconnection points.

**A.**

In 2015, San Francisco entered a new contract with PG&E for service under its open-access Tariff. Complaint at 2. Under their previous agreement, 96% of its end-users were connected to PG&E's distribution system at secondary voltage. *Id.*, Maslowski Decl. ¶ 6. PG&E allows retail customers to receive secondary voltage if their demand is below 3,000 kW. Complaint, Maslowski Decl. ¶ 7. PG&E currently provides secondary-voltage service to the Western Area Power Administration ("Western") and the Power and Water Resources Pooling Authority ("Pooling Authority") for demands as high as 428 kilowatts ("kW") for Western and

1,296 kW for the Pooling Authority. Request for Rehearing at 16-17.

On January 28, 2019, San Francisco filed a complaint with the Commission pursuant to Sections 206, 306, and 309 of the Federal Power Act ("FPA"), 16 U.S.C. §§ 824e, 825e, 825h. San Francisco alleged that PG&E has "consistently" refused to make new interconnections at secondary voltage unless the total electricity demand is less than 75 kW. Complaint at 10. This practice, it claimed, (1) was unjust, unreasonable, and unduly discriminatory, and (2) violated the terms of the Wholesale Distribution Tariff. *Id.* at 1. Further, it alleged that PG&E had categorically denied San Francisco's applications for secondary-voltage service for demands above 75 kW while granting secondary-voltage service for much larger demands for its own retail customers and other wholesale customers such as Western. *Id.* at 3, 21, Maslowski Decl. ¶ 27. PG&E's denials of secondary-voltage service, allegedly, "have imposed undue burdens and costs on San Francisco," including "delays." *Id.* at 31-32. Yet PG&E's Tariff required it to offer secondary service whenever requested, and to expand its infrastructure when such service was initially infeasible. *Id.* at 23-27. San Francisco also objected to PG&E's refusal to provide "primary plus" service in the alternative, where San Francisco would receive secondary voltage while paying PG&E for maintaining the facilities necessary to provide secondary voltage. *Id.* at 16, Maslowski Decl. ¶ 9.

PG&E acknowledged that its Tariff provides for two levels of service but maintained that it had not given customers the right to dictate the level of service to be received. Answer to Complaint at 5-6. It also denied that it had a categorical 75 kW threshold for secondary-voltage applications, noting that most of San Francisco's new interconnections were at secondary voltage, including many above 75 kW, and that it had regularly

granted variances to San Francisco. *Id.* at 7-15. Any denials of secondary-voltage service, it asserted were supported by "technical, safety, reliability, and operational reasons." *Id.* at 15. Further, PG&E claimed that San Francisco was to blame for many of the delays in service, *id.* at 23, and that Western's secondary-voltage service was governed by a settlement agreement to which San Francisco is not a party, *id.* at 28-29.

Evidence before the Commission showed that since 2015, many of San Francisco's new interconnection requests exceeding 75 kW have been denied secondary service by PG&E, and that the proportion of new interconnections above 75 kW receiving primary service has increased since 2015. *See id.* at 11 (chart 3). Specifically, PG&E had stated that "if the requested [demand] exceeds 75 kW, PG&E informs [San Francisco] that it will need to take primary service." *Id.* at 30. In some instances, San Francisco was initially denied secondary-voltage service, but negotiated for secondary voltage or a "secondary metering" arrangement, reducing its costs of receiving primary voltage. Complaint at 13-14; Decl. of Barbara Hale, Asst. Gen. Mgr., San Francisco Public Utilities Commission, ¶¶ 9-11. In July 2019, PG&E advised San Francisco that it "is not willing to make additional accommodations without a long-term solution." Letter from Yilma Hailemichael, PG&E Mgr., to Ramon Abueg, Dep. Mgr. Operations at San Francisco Pub. Utils. Comm'n, at 3 (July 1, 2019) (hereinafter, the July 1, 2019 Letter).

The Commission denied San Francisco's complaint, ruling that PG&E should retain discretion to determine what level of service is most appropriate for a customer because the provider "is ultimately responsible for the safety and reliability of its distribution system." Order, 171 FERC ¶ 61,021 at P 38 (2020). It found that San Francisco received secondary service for the "majority of its interconnections with PG&E," *id.* P 36,

as well as variances for other interconnections. *Id.* P 37. Noting that "primary service is the norm for utility-to-utility interconnections," *id.*, the Commission distinguished the service provided to retail customers and wholesale customers whose service was governed by a settlement agreement. *Id.* PP 37-38, 42. In its view, San Francisco was to blame for delays, which were "largely a consequence of requesting interconnection for projects with [demands] greater than what PG&E has normally accepted for secondary service" and "San Francisco's own delays in responding to PG&E." *Id.* PP 39-40. The Commission denied San Francisco's request for rehearing. Order Addressing Arguments Raised on Rehearing, 172 FERC ¶ 61,021 (2020) (Rehearing Order).

San Francisco petitions for review of the Order and Rehearing Order (collectively, the "Voltage Orders").

**B.**

San Francisco contends in petitioning for review that (1) the Commission's Voltage Orders were arbitrary and capricious in deeming PG&E's secondary-service practice just and reasonable, (2) the Commission failed to meet its mandate under the FPA to prevent undue discrimination, and (3) the Voltage Orders are inconsistent with PG&E's Tariff and the filed-rate doctrine.

**1.**

As a threshold matter, PG&E maintains that San Francisco's first and second challenges are moot in light of PG&E's proposal of a revised tariff that offers only primary service. Thus, ruling in San Francisco's favor on either of the two issues would have no remedial effect, it claims, because PG&E "no longer has discretion . . . to allow secondary voltage

interconnections." PG&E Br. 15. PG&E concedes that San Francisco's claim that PG&E violated its original tariff is not moot because retrospective relief is still available. PG&E Br. 19. PG&E's mootness argument is unpersuasive given the provisional nature of the proposed tariff revision.

A "case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted). San Francisco petitioned for review of the Order denying its complaint on August 17, 2020. On September 15, 2020, PG&E filed proposed tariff changes, which the Commission accepted on November 13, 2020, while expressing no view on whether the revised tariff was just, reasonable, and nondiscriminatory. *Pac. Gas & Elec. Co.*, 173 FERC ¶ 61,140 at P 42 (2020). The Commission suspended the proposed revisions for five months, to be effective April 15, 2021, and ordered an evidentiary hearing on its legality. *Id.* The hearing was held in abeyance to encourage settlement discussions, which, as of November 23, 2021, are ongoing. Status Report of Settlement Judge, FERC Docket No. ER20-2878 (Nov. 23, 2021).

The Commission's "[a]cceptance of a filing decides nothing concerning the merits of a case; it merely reserves the issues pending a hearing." *Papago Tribal Util. Auth. v. FERC*, 628 F.2d 235, 240 (D.C. Cir. 1980). There, the court held that the Commission's refusal to reject a rate filing was an interlocutory decision that was not final, reviewable agency action. *Id.* Under PG&E's logic, a utility could moot any challenge to its conduct by filing a revised tariff with the Commission that would require that conduct. Because the Commission has not ruled on the legality of the revised tariff, and because San Francisco also seeks retrospective relief, its claims are not moot.

10

**2.**

Turning to the merits, San Francisco contends that the Commission did not identify any "safety or reliability risks" that would arise from providing secondary-voltage service to San Francisco. SF Br. 28. Rather, it maintains that the Commission "offers only vague conclusory statements about PG&E's general need to assure safety and reliability," which are not grounds on which the Voltage Orders can be upheld. *Id.* at 29.

The court reviews the Commission's orders under the arbitrary and capricious standard. *See, e.g.*, *Emera Me. v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017). A court "must uphold a rule if the agency has 'examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

PG&E identified two concerns in its Answer to the Complaint. First, the request for secondary-voltage service might be too far from the necessary infrastructure. Answer to Complaint at 6. Second, secondary-voltage equipment lacks unique operating numbers, making it more difficult to service. *Id.* at 16. The Commission's Voltage Orders, however, do not reference any specific risks to safety or reliability with respect to San Francisco's requests. The Commission concluded only that PG&E is "ultimately responsible for the safety and reliability of its distribution system" and should have "discretion to determine what level of service is both appropriate and available based upon the status and

configuration of its . . . facilities and the nature and location of the interconnection request." Order P 38. For support, the Commission cites page 6 of PG&E's Answer without explanation. *Id.* P 38 n.82.

The Commission's "passing reference to relevant factors," such as safety and reliability, "is not sufficient to satisfy the Commission's obligation to carry out 'reasoned' and 'principled' decisionmaking." *Mo. Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000). That is so when the Commission refers only generally to safety and reliability without explaining what the risks are, much less examining PG&E's claims. A declaration by PG&E engineer Michael Thibault stated that "interconnection at the secondary voltage level between utilities is not at all typical and . . . is not 'Good Utility Practice,'" and that "secondary interconnections between utilities create ambiguity and operational and engineering challenges." Order P 37 n.79 (citing Answer to Complaint, Thibault Decl. ¶¶ 11-12). Although this suggests that providing secondary service to a utility may present challenges for PG&E, the declaration does not concretely describe the challenges with respect to San Francisco's requests for secondary service.

Further, the Commission's conclusion that PG&E should have discretion to determine which voltage level is most appropriate is belied by the record to the extent PG&E would apply a categorical rule. The July 1, 2019 Letter hardly indicates that PG&E intends to evaluate San Francisco's applications on a case-by-case basis. *See* July 1, 2019 Letter at 3. Although the Commission viewed PG&E's statement to be "primarily in reference to specific projects" and that San Francisco's concerns about being denied accommodations were "speculative," Order P 40 n.90, the Commission cited no portion of the Letter that limits its relevance to specific projects

and provided no reason that a "long-term solution" is possible or probable.

San Francisco also contends that the Commission was arbitrary and capricious in concluding that PG&E may deny secondary-voltage service to San Francisco because the industry norm for utility-to-utility interconnections is primary voltage. Here, it contends that the Commission failed to address the fact that San Francisco interconnects to PG&E at numerous small points of interconnection, rather than a few large points as is typical for a utility-to-utility interconnection. Reply to Answer at 15-16; Request for Rehearing at 30-31. Neither of the Voltage Orders explain why deference to industry norms is reasonable in light of San Francisco's geographical configuration, which differs from that of other utilities. *See* Request for Rehearing at 30-31. Rather, the Commission applied the industry norm with no explanation beyond stating that such norms "inform expectations." Rehearing Order P 9 n.23. Maybe so. But the Commission does not explain why San Francisco should have expected to be bound by an industry norm involving much higher demands than it has historically required, or why its expectations are a valid basis for PG&E's denials of its requests. Again, the Commission's passing reference to "ambiguity and operational or engineering challenges" arising from secondary interconnections between utilities without further elaboration, does not provide sufficient justification for its conclusion. Order P 37 n.79 (citing Answer to Complaint, Thibault Decl. ¶¶ 11-12). Consequently, the Voltage Orders do not satisfy arbitrary-and-capricious review. *See State Farm*, 463 U.S. at 43.

**3.**

Additionally, San Francisco contends that the Commission failed to meet its mandate to prevent undue discrimination, because PG&E offers secondary service to two wholesale customers, Western and the Pooling Authority, at higher voltages than 75 kW, and to retail customers at voltages up to 3,000 kW. When faced with a claim of undue discrimination, the Commission "must reasonably explain *how* the existing suppliers and new entrants are not similarly situated and in what respects the reasons are material." *New Eng. Power Generators Ass'n v. FERC*, 881 F.3d 202, 213 (D.C. Cir. 2018) (citing *Edison Mission Energy, Inc. v. FERC*, 394 F.3d 964, 968-69 (D.C. Cir. 2005)).

The Commission has adequately explained why San Francisco is not similarly situated to Western and the Pooling Authority, noting that both of them receive secondary service under settlement agreements with PG&E, and that the Pooling Authority is not eligible for Tariff service. Order P 37 & n.79. Western's settlement "reflects a bargained-for agreement between PG&E & Western," and San Francisco has not shown that it and its customers are similarly situated to Western and its customers. *Id.* P 42. But the Commission's response to San Francisco's claims regarding retail customers was inadequate. On the other hand, the Commission views "a retail-level standard . . . [a]s not necessarily congruent with the requirements of interconnecting wholesale customers such as San Francisco," *id.* P 38, and that San Francisco's "mere assertion of [the retail standard's] relevance is not sufficient to satisfy San Francisco's section 206 burden of proof," Rehearing Order P 13. Beyond asserting "relevance," San Francisco cited instances when its customers began retail service with PG&E during San Francisco's wholesale service negotiations with PG&E. *See* Complaint, Hale Decl. ¶¶ 25-30.

The Commission accepted PG&E's explanation that these San Francisco customers only took temporary retail construction power service from PG&E, Order P 40, but this fact confirms that PG&E can compete with San Francisco through its retail offerings. The Commission's conclusion that retail service is "not necessarily congruent" does not meet its burden of reasoned decision-making.

**4.**

San Francisco further contends that the Voltage Orders are inconsistent with the terms of PG&E's Tariff, which it interprets to require PG&E to provide secondary-voltage service whenever requested, and that PG&E's contrary practice violates the filed-rate doctrine. The filed rate objection is more problematic.

**a.**

When San Francisco filed its petition, PG&E's Tariff stated that PG&E will "provide Distribution Service pursuant to the applicable terms and conditions contained in this Tariff and Service Agreement." Tariff § 1.2. After receiving an application for service, PG&E must "make a determination of available distribution capacity." Tariff § 15.5. Section 13.4 of the Tariff stated:

> If the Distribution Provider determines that it cannot accommodate a Completed Application for Distribution Service because of insufficient capability on its Transmission System or Distribution Facilities, the Distribution Provider will use due diligence to expand or modify its Distribution System to provide the requested Distribution Service, provided the Distribution

> Customer agrees to compensate the Distribution Provider for such costs . . . .

San Francisco thus alleged that because the Tariff defines "Distribution System" to include the secondary distribution system, Complaint at 23 (citing Tariff § 11), PG&E must expand its secondary distribution system to meet any customer request for secondary-voltage service, pursuant to Tariff Section 13.4.

The Commission concluded that "[w]hile the [Tariff] does not preclude a [Tariff] customer from requesting the level of service that it wishes to take," PG&E should retain "discretion to determine what level of service is both appropriate and available based upon the status and configuration of its existing . . . facilities and the nature and location of the interconnection request." Order P 38. As a result, "PG&E has not violated the terms of the [Tariff]." *Id*. P 35. The court has long held that the Commission's interpretation of a tariff receives "*Chevron*-like deference." *Consol. Edison Co. of New York v. FERC*, 347 F.3d 964, 972 (D.C. Cir. 2003) (internal citations omitted). If the terms of the tariff are unambiguous, the court need not defer to the Commission's interpretation. If the text is ambiguous, there the court must defer if the Commission's interpretation is reasonable. *Id.* The Tariff then in effect unambiguously confirms the Commission's interpretation. Although PG&E must use due diligence to adjust its system to provide the "requested Distribution Service," Tariff § 13.4, "Distribution Service" is defined as "[t]he transporting of electric power over and through various PG&E facilities for delivery to a Distribution Customer." Tariff § 2.15. The fact that PG&E must provide wholesale distribution service when requested does not necessarily imply that it is required to provide the voltage San Francisco requests.

**b.**

On the other hand, San Francisco correctly notes that PG&E's practice of requiring primary-voltage service for demands above 75 kW is not stated in its Tariff and therefore may violate the filed-rate doctrine. Under that doctrine, "utilities are forbidden to charge any rate other than the one on file with the Commission," *West Deptford Energy LLC v. FERC*, 766 F.3d 10, 12 (D.C. Cir. 2014), a prohibition that is understood to extend to other utility practices that affect rates and service. *See Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804, 811 (D.C. Cir. 2007). The "rule of reason" requires "utilities [to] file 'only those practices that affect rates and service significantly, that are realistically susceptible of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous.'" *Id.* (quoting *City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985)). Contrary to PG&E's view, San Francisco did not waive this argument but, in fact, raised it in requesting rehearing. *See* Request for Rehearing at 11-12; *see also* Reply to Answer at 8-9. *But see* PG&E Br. 25 (citing 16 U.S.C. § 825l(b); *Allegheny Power v. FERC*, 437 F.3d 1215, 1220 (D.C. Cir. 2006)).

On rehearing, the Commission stated that the 75 kW threshold is merely a "guidepost," Rehearing Order P 10, while reaffirming its position that PG&E makes case-by-case determinations of which voltage to provide, Order P 43 & n.96. Yet, as noted, the record suggests that PG&E intends to apply a categorical rule going forward. July 1, 2019 Letter at 3; Answer to Complaint at 30. Even if the 75 kW threshold is a guidepost, however, that kind of numerical threshold is the type of requirement that the "rule of reason" requires be stated in the Tariff, as a numerical threshold is "realistically susceptible of specification," *Keyspan-Ravenswood*, 474 F.3d at 811.

PG&E's policy significantly "affect[s] rates and service" because it affects which voltage level San Francisco may receive, and different voltages have different rates. *Id.* It also cannot be "so generally understood . . . as to render recitation superfluous," given PG&E's secondary-voltage connections for demands above 75 kW and its provision of secondary-voltage service to San Francisco prior to the 2015 transition to Tariff service. *Id.* Although primary voltage may be the industry norm for utility-to-utility interconnections, and PG&E should have discretion to provide secondary voltage on a case-by-case basis, *see* Order P 43, the Commission does not explain why these factors exempt the guidepost from specification in the Tariff under the "rule of reason."

Because the Commission did not adequately explain any operational or engineering rationale justifying PG&E's 75 kW "guidepost" and did not explain why that guidepost did not need to be in the filed tariff, the court vacates the Voltage Orders and remands the case to the Commission for further proceedings consistent with this opinion.

**III.**

San Francisco's complaint in No. 20-1084 concerns the proper interpretation of a section of PG&E's Tariff on grandfathering.

**A.**

Section 14.2 requires customers to demonstrate "bona fide ownership or control of . . . Intervening Distribution Facilities . . . *except in the case where an Eligible Customer meets the criteria for grandfathering in 16 USC § 824k(h)(2)* [Section 212(h)(2) of the FPA]" (emphasis added). This section was added as the result of a 2015 Commission-approved settlement

between PG&E and its Tariff customers. Offer of Settlement, FERC Docket No. ER13-1188-037, eLibrary No. 20150331-5502 (Mar. 31, 2015). Although PG&E and San Francisco agree that PG&E is bound by Section 212(h)(2) of the FPA, 16 U.S.C. § 824k(h)(2), they disagree about its scope.

On October 9, 2014, San Francisco filed a complaint with the Commission alleging, among other claims, that PG&E was improperly denying Tariff service to some of San Francisco's delivery points. San Francisco argued that PG&E was required to serve any San Francisco customer served in 1992, regardless of whether the customer stayed at the same location. Complaint at 18-20. PG&E responded that it would serve any of San Francisco's locations that it had served in 1992 but would not serve delivery points of 1992 customers that had relocated or opened new locations. Answer to Complaint at 35-36 .

FPA Section 212(h) provides:

> No order issued under this chapter shall be conditioned upon or require the transmission of electric energy:
>
> (1) directly to an ultimate consumer, or
>
> (2) to, or for the benefit of, an entity if such electric energy would be sold by such entity directly to an ultimate consumer, *unless*:
>
> (A) such entity is a . . . State or any political subdivision of a State (or an agency, authority, or instrumentality of a State or a political subdivision) . . . [listing other categories]; and

(B) such entity *was providing electric service to such ultimate consumer on October 24, 1992*, or would utilize transmission or distribution facilities that it owns or controls to deliver all such electric energy to such electric consumer. (emphasis added)

On December 23, 2014, PG&E filed with the Commission a proposed replacement agreement under which PG&E would provide Tariff service to any San Francisco delivery point that received service in 1992. Proposed Service Agreement, App. C. So any delivery point that did not receive service in 1992 but did receive service in 2015 (when the bilateral agreement would expire) would receive what PG&E calls Tariff-equivalent service, if the delivery point was a "municipal load," *id.*, App. D. PG&E defined "municipal load" as:

"Municipal Public Purpose End-Use Customers" ("Muni Load") are served at metered Points of Delivery providing power to [San Francisco's] governmental departments and agencies, public housing tenants, municipal transportation system, police stations, fire departments, public schools, city parks and public libraries. Non-governmental private persons (other than [San Francisco] public housing tenants) and non-governmental private corporations are not Municipal Public Purpose End-Use Customers. Small Unmetered Street Loads served under Appendix E [such as streetlights or traffic signals] are not Municipal Public Purpose End-Use Customers.

*Id.*, App. D § D.1.1. Non-municipal loads served in 2015 but not in 1992 would receive Tariff-equivalent service if the

delivery point continues to serve the same end-use customer as in 2015 and the electricity demand does not exceed 125 percent of the customer's average annual demand on June 30, 2015. *Id.*, App. D §§ D.1.2, D.2.

An Administrative Law Judge interpreted FPA Section 212(h)(2)(B) in light of the Commission's decision in *Suffolk County Electric Agency*, 96 FERC ¶ 61,349, at 62,301 (Nov. 15, 2001). There, the Commission concluded that Section 212(h) grandfathered the "<u>class</u> of customers eligible to receive service." *Id*. The ALJ determined that "the Commission's orders and opinions . . . support San Francisco's argument that grandfathering applies to the <u>class</u> of customers that was eligible to receive wholesale distribution service on October 24, 1992, regardless of where in the City those customers may be located now or in the future." Initial Decision P 135 (internal citations omitted). Therefore, the ALJ defined the "class" of customers as all "municipal public purpose load[s]." *Id.* P 142. He also concluded that he was "without authority" to define a "municipal public purpose" for the Commission. *Id.* P 146.

In Opinion No. 568, the Commission reversed. 169 FERC ¶ 61,128 at P 67 (Nov. 21, 2019). Distinguishing its FPA Section 212(h) precedent as involving proceedings seeking an order of mandatory service under FPA §§ 210 and 211, the Commission noted that San Francisco filed its complaint under § 206 and PG&E filed its proposed replacement agreements under § 205, *id*. P 67 n.154. Further, the Commission stated that it was not "interpreting the scope of section 212(h)," but instead only interpreting PG&E's Tariff. *Id.* Noting that other provisions of the Tariff referenced "points of delivery," the Commission viewed the "points of delivery framework" to favor PG&E's interpretation of Section 14.2. *Id.* PP 69-70. By contrast, in the Commission's view, San Francisco's

interpretation "would automatically grandfather *all* San Francisco customers, thereby negating the point of delivery framework." *Id.* P 69. The Commission also accepted PG&E's definition of "municipal load" as "effectively distinguish[ing] between what is to be considered municipal load . . . and what is not." *Id.* P 72. In denying San Francisco's petition for rehearing, the Commission offered a clarification, stating that PG&E's interpretation of the Tariff was consistent with *Suffolk County*'s "class-based approach" because PG&E was still providing service to the "class of customer [San Francisco] was appropriately serving as of October 24, 1992," but "only for the universe of delivery points as they existed on June 30, 2015." Rehearing Order, 171 FERC ¶ 61,196 at P 28 (June 4, 2020).

San Francisco petitions for review of Opinion No. 568 and the Rehearing Order (collectively, the "Grandfathering Orders"). The Court accords the Commission's interpretation of filed tariffs *Chevron*-like deference. *See supra* Subsection II.B.4.a. Although the Court will defer to the Commission's interpretation of its own precedent, the Commission must acknowledge that it is departing from its precedent and provide a reasoned explanation indicating that prior policies and standards are being deliberately changed, not casually ignored. *ESI Energy, LLC v. FERC*, 892 F.3d 321, 329 (D.C. Cir. 2018).

**A.**

Section 14.2 of the Tariff provides, by its plain terms, an exception to the required ownership or control of intervening Distribution facilities for customers that "meet[] the criteria for grandfathering in 16 USC § 824k(h)(2)." The text unambiguously indicates that the Tariff incorporates the requirements of FPA Section 212(h)(2). The parties had agreed in a Joint Brief to the Commission that they "referenced Section 212(h) of the FPA to define the requirements and

boundaries of eligibility for service under PG&E's [Tariff]," and that "[t]he intent of [that reference] in the [Tariff] as it pertains to grandfathering was to ensure that the Commission's interpretation of the statute was incorporated into the [Tariff's] eligibility rules." Joint Brief at 2-3 (Sept. 24, 2018). The Commission, however, expressly disclaimed that it was "interpreting the scope of [Section] 212(h) or the precedent thereunder beyond the salient point that they are not applicable in this [Section 206] proceeding." Opinion No. 568 P 67 n.154. Because the Commission based its decision in Opinion No. 568 on requirements other than those in Section 212(h), the court owes no deference to its interpretation of unambiguous Tariff text.

The Commission's attempts to defend its interpretation are unpersuasive. First, the Commission states that "the [Tariff] frames [PG&E's] distribution service in terms of delivery points," and that service should therefore be grandfathered on a location-by-location basis. Opinion No. 568 P 70 & n.160. Tariff Section 14.2 itself requires applicants to prove that the criteria of FPA Section 212(h)(2) are met "for each Point of Delivery," and Tariff Section 15.5.1 states that a distribution provider may reject service on the ground that "it disputes that the Point of Delivery qualifies." That the Tariff references "points of delivery" does not necessarily imply that only specific points of delivery may be grandfathered, and those references to "points of delivery" do not change the fact that the Tariff expressly references the criteria of Section 212(h)(2).

Second, the Commission views PG&E's narrow interpretation of Section 212(h)(2) to employ the class-based approach used by the Commission in *Suffolk County* because it effectively grandfathers "each delivery point it was serving (as of June 30, 2015), as long as the customer at that delivery point is a member of the class of customer [San Francisco] was

appropriately serving as of October 24, 1992." Rehearing Order P 28 (quoting PG&E Brief on Exceptions at 13-14). This is true in the sense that PG&E has proposed to provide Tariff service or Tariff-equivalent service to all municipal loads it served in 2015. But this is not the same as ruling those loads are Tariff-eligible. PG&E's voluntary accommodations for the excluded delivery points do not justify the Commission's interpretation of the Tariff, and the Commission acknowledged that applying *Suffolk County* supports San Francisco's approach. Opinion No. 568 P 69.

Third, the Commission viewed San Francisco's interpretation of the grandfathering exception to render Section 14.2 meaningless, "because *all* customers within the class of customers taking service on October 24, 1992 would be grandfathered in perpetuity." Rehearing Order P 24. Not so. Under San Francisco's interpretation, PG&E's customers must satisfy the criteria of Section 212(h)(2) to qualify for grandfathering: be an eligible entity that served end-use customers as of October 24, 1992. Any end-use customers San Francisco did not serve in 1992 could not qualify for the Section 14.2 exception.

Fourth, as PG&E notes, the court will generally defer to the Commission's interpretation of its own precedent. But not when the Commission "depart[s] from those rulings without provid[ing] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *ESI Energy*, 892 F.3d at 329 (internal quotation marks and citation omitted). The Commission attempts to distinguish its precedent on the ground that San Francisco filed its complaint under FPA § 206 while the cases in *Suffolk County* concerned proceedings for mandatory interconnection under FPA §§ 210 and 211. Opinion No. 568 P 67 n.154. Here, however, the Commission expressly declined to interpret

Section 212(h), ignoring the unambiguous terms of the Tariff. *Id.* Even interpreting the Grandfathering Orders to create different interpretations of Section 212(h) for § 210 and 211 proceedings and another for § 205 and 206 proceedings, the Commission failed to explain why Section 212(h)(2)'s criteria would have different meanings in those contexts.

**B.**

San Francisco also contends that the Commission was arbitrary and capricious in accepting PG&E's definition of "municipal load" because it excludes from grandfathering certain customers that were receiving service in 1992. Under the Commission's Section 212(h) precedent, the Tariff's grandfathering clause covers "the <u>class</u> of customers eligible to receive service" on October 24, 1992. *Suffolk County*, 96 FERC ¶ 61,349, at 62,301 (2001). That is, the Tariff allows grandfathering of a customer San Francisco served under the prior interconnection agreement even though that customer seeks Tariff service at a new delivery point. Therefore, the court must address whether the Commission's definition of "municipal load" excludes customers San Francisco served prior to the grandfathering date.

As noted, the Commission accepted PG&E's definition because it "effectively distinguishes between what is to be considered municipal load . . . and what is not," and that although PG&E's definition of "municipal load" differed from the definition in San Francisco and PG&E's 1987 bilateral agreement, "a new contract may well have new terms and definitions." Opinion No. 568 P 72; *see* Rehearing Order PP 33-34. True, but the Commission's analysis of "municipal load," like its interpretation of Section 14.2 of the Tariff, failed to address the grandfathering criteria of Section 212(h)(2), much less the Commission's precedent interpreting it. The

Commission acknowledged that *Suffolk County* would require grandfathering of a customer San Francisco served under the prior interconnection agreement in 1992 even though that customer seeks Tariff service at a new delivery point. Opinion No. 568 P 69. And the Commission expressly accepted PG&E's definition to "describe the class of customers that San Francisco was serving as of October 24, 1992." Rehearing Order P. 18. Yet PG&E's definition would exclude entities served in 1992, including private parking garages on City property, tenants at San Francisco International Airport, and SOMArts, a neighborhood arts program partially funded by the San Francisco Arts Commission. *See* Ex. SF-2 at 14, 15; Ex. SF-6 at 7-11; Ex. PGE-5 at 10. Because the Commission's Grandfathering Orders do not acknowledge the conflicts between PG&E's definition of "municipal load" and its own precedent interpreting Section 212(h)(2) criteria, the Grandfathering Orders are arbitrary and capricious.

Finally, the court notes that the orders on review present a troubling pattern of inattentiveness to potential anti-competitive effects of PG&E's administration of its open-access Tariff. More than a century ago, Congress authorized the Hetch Hetchy System not only to provide San Francisco with a source of cheap power but also to ensure competition in its retail power market. Faced with claims that PG&E was frustrating that competition by treating its own retail service preferentially and refusing service for customers San Francisco had served for decades, the Commission fell short of meeting its "duty" to ensure that rules or practices affecting wholesale rates are "just and reasonable*." Elec. Power Supply Ass'n*, 577 U.S. at 277.

Accordingly, the court grants San Francisco's petitions challenging the Voltage Orders in No. 20-1313 and the Grandfathering Orders in No. 20-1084, vacates those orders,

and remands to the Commission for further proceedings consistent with this opinion.